IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WILLIAM JOSEPH HUGHES,
Petitioner,

v.                                                                       Civil No. 3:20cv34 (DJN)

HAROLD W. CLARKE, DIRECTOR,
Respondent.

### MEMORANDUM OPINION

This matter comes before the Court on Respondent Harold W. Clarke's ("Respondent") Motion to Dismiss and Rule 5 Answer (ECF No. 6.) William Joseph Hughes ("Petitioner" or "Hughes"), a Virginia state prisoner proceeding with counsel, filed his petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition" (ECF No. 1)) challenging his conviction of first-degree murder in the Circuit Court of the City of Stafford, Virginia ("Circuit Court"). In his § 2254 Petition, Petitioner seeks relief based upon the following ground:

> Claim One: "Counsel unreasonably refused to use Vellan Rogers as a witness who would have testified that the Petitioner sat her and [Jason] Plaster down, instructed Plaster to stay away from her, and Plaster did as requested, thereby putting an end to the controversy." (*Id.* at 11.)[1]

Respondent moves to dismiss on the ground that Petitioner's claim lacks merit. Petitioner did not respond. For the reasons stated below, Respondent's Motion to Dismiss will be GRANTED.

### I. PROCEDURAL HISTORY

Petitioner faced charges of first-degree murder and use of a firearm in the commission of that murder. *See Commonwealth v. Hughes*, Nos. CR13000429–00 and 01, at 1 (Va. Cir. Ct.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court omits the emphasis in the quotations from Hughes's submissions.

Aug. 5, 2013). Following a trial, a jury convicted Petitioner of first-degree murder, but found him not guilty of use of a firearm. *See Hughes*, Nos. CR13000429-00 and 01, at 1-2 (Va. Cir Ct. Oct. 20, 2014). The Circuit Court sentenced Petitioner to twenty-seven years of incarceration as set by the jury. *See id.* Petitioner appealed. The Court of Appeals of Virginia affirmed Petitioner's conviction. *See Hughes v. Commonwealth*, No. 1983-14-4, 2016 WL 1742696, at *1 (Va. Ct. App. May 3, 2016). The Supreme Court of Virginia refused Petitioner's subsequent petition for appeal. (*See* ECF No. 7-4, at 1.)

On February 6, 2018, Petitioner filed a petition for a writ of habeas corpus in the Supreme Court of Virginia raising two claims, including Claim One presented here in his § 2254 Petition. (*See* ECF No. 7-5, at 1, 10, 13.) After a hearing, the Circuit Court found that Petitioner's claims lacked merit and denied the habeas petition. (ECF No. 7-6, at 1-3.) The Supreme Court of Virginia dismissed Petitioner's subsequent petition for appeal. (ECF No. 7-8, at 1.)

## II. STANDARD OF REVIEW

To obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 further circumscribed this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

### III. ANALYSIS

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, the Court need not determine whether counsel performed deficiently if it can readily dismiss the claim for lack of prejudice. *Id.* at 697.

#### A. Summary Of The Evidence.

Petitioner's sole claim stems from counsel's failure to call Vellan Rogers, Petitioner's daughter, who would have allegedly testified that Plaster had made sexual advances toward her,

3

but that Petitioner and Plaster had resolved their dispute prior to his murder. As discussed below, the Court fails to discern how Rogers's testimony would have had any impact on Petitioner's trial in light of the overwhelming evidence of his guilt.

The Court of Appeals of Virginia aptly summarized the evidence of Petitioner's guilt as follows:

> [T]he evidence established that Jason Plaster disappeared in July 2007. Police found his body in 2013 after Dennis Benzie told them that Hughes killed Plaster near Benzie's house and buried him there.
> At Hughes's trial, Benzie and Stuart Sullivan testified that Hughes killed Plaster because he made sexual advances toward Hughes's wife and daughter. Hughes, Benzie, and Sullivan each participated in the murder. The three men devised a plan to lure Plaster to Benzie's secluded property and kill him there. Pursuant to this plan, Hughes and Sullivan brought Plaster to Benzie's property to look at a motorcycle. After the men looked at the motorcycle, Benzie suggested that they go into the woods surrounding his home to dig up some guns he had hidden. At some point after the men entered the woods, Hughes shot Plaster in the chest with a derringer pistol. Sullivan then shot him with a .9 mm pistol. The men covered Plaster's body with lime and buried it in the woods. Later, Benzie drove Plaster's car away from his property and abandoned it in a high-crime area, leaving the keys in the ignition to encourage someone to steal the car.
> Hughes challenged the credibility of Benzie and Sullivan by cross-examining them about the benefits they received for implicating him in the murder and testifying against him. Benzie testified that he had entered into an immunity agreement with the Commonwealth that shielded him from prosecution for murder charges related to Plaster's death. Benzie explained, however, that the agreement did not protect him from prosecution for all charges stemming from his role in the murder and that he was currently being prosecuted on related charges. On redirect examination, Benzie also explained that he had risked his personal safety by testifying against Hughes, and described an incident which two men attacked him with knives in jail because he was a "snitch."
> Sullivan testified about the plea agreement he made with the Commonwealth in exchange for his testimony against Hughes. Under the terms of that agreement, Sullivan agreed to plead guilty to second-degree murder for his role in Plaster's death in exchange for a sentence within the range recommended by the sentencing guidelines. Like Benzie, Sullivan testified that he risked his safety by testifying against Hughes. He testified that he knew Hughes was a "felon" and a "criminal" and that Hughes had told him about an incident where he had beaten a man with a hammer when he refused to sell drugs to him. He also testified that Hughes had told him that he had been in several bar fights.
> Additionally, Sullivan testified that he was afraid of Hughes because of "the kinds of people he [ran] around with." Sullivan testified that Hughes was

4

currently a member of the Warlocks motorcycle club and that Hughes's membership in the club caused him concern. Sullivan testified that he feared for his personal safety while he was in prison, as well, as the safety of his family. Due to his fear of Hughes, Sullivan testified that he wore a hood to conceal his identity when he helped the police find Plaster's body.

. . . .

After the Commonwealth rested its case, Hughes testified on his own belief and denied that he had any role in Plaster's murder. On cross-examination, he admitted he was the president of a local chapter of the Warlocks motorcycle club and that he owned the items related to the Warlocks that were seized by the police. Hughes also admitted that the club was a "one percenter" group and specifically agreed with Nosal's testimony regarding the origins of that term. Hughes explained, however, that he was not a member of the Warlocks in 2007 when Plaster disappeared. When asked about the activities of the Warlocks, Hughes stated that they were a "bunch of guys who liked to ride motorcycles," who held annual events to support their club.

At the conclusion of Hughes's trial, the jury convicted him of first-degree murder and sentenced him to twenty-seven years of incarceration.[] The circuit court imposed the jury's sentence, and this appeal followed.

. . . .

In the present case, the Commonwealth presented substantial evidence at trial establishing Hughes's guilt of the charged offense. Benzie and Sullivan provided eyewitness testimony about the murder. A third witness, Benzie's brother-in-law, also testified that he saw Hughes, Benzie, Sullivan, and Plaster on Benzie's property together sometime in 2007 and that he observed a big bag of lime in Hughes's truck on that occasion. This witness testified that Benzie told him not to accompany the men into the woods that day. He also testified that he recovered a derringer pistol that had been buried on the property using a medical detector at Hughes's and Benzie's request.

Additionally, physical evidence corroborated several aspects of Benzie's and Sullivan's testimony. Consistent with Benzie's testimony, Plaster's car was found in a high-crime area with the keys in its ignition shortly after his disappearance. Consistent with the testimony of both witnesses, a .9 mm bullet was found in Plaster's skull and his ribs had been damaged by another gunshot. Furthermore, lime was found in the soil around his body. Hughes's cell phone records also provided independent evidence linking him to the crime. Although he frequently called Plaster before his disappearance, he abruptly stopped calling him after he disappeared.

*Hughes*, 2016 WL 1742696, at *1–5.

### B.  Counsel Did Not Render Ineffective Assistance

In Petitioner's sole claim, he contends that, "[c]ounsel unreasonably refused to use Vellan Rogers as a witness who would have testified that the Petitioner sat her and Plaster down,

5

instructed Plaster to stay away from her, and Plaster did as requested, thereby putting an end to the controversy." (ECF No. 1, at 11.) In essence, Petitioner argues that Rogers would have testified that Plaster had acted in an untoward way to her, and that Petitioner, her father, had put a stop to the behavior months before Plaster's murder. In his § 2254 Petition, Petitioner contends that the "crux of [Rogers's] testimony would have been:"[2]

> Rogers graduated high school in 2006, and met Plaster, his wife, and three young children around that time. Plaster was looking for work, and his family was homeless.
> Even though the Petitioner was not hiring, he was a very sympathetic man, especially toward the well-being of children. He offered Plaster a job cleaning up around the shop. The Petitioner also spoke to the landlord of the house next door to the Petitioner's home to see if he could get a roof over their heads. Shortly after, Plaster and his family moved in next door, and the two families became close. The Petitioner would buy groceries from time to time to help feed Plaster's kids.
> Plaster acted very strangely sometimes, and Plaster would often disappear for two or three days. When he would return, it was evident he had been using hard drugs. His wife, Christi, would need help watching the kids sometimes, especially when Plaster was gone for several days. Rogers offered to baby sit for them since she had gotten to know the kids pretty well.
> One evening, during the winter months, Plaster asked Rogers to come over to their house to watch the kids. When Rogers got there, Plaster was home, but his wife was in the bedroom with the door shut. The kids were in bed. Rogers got a strange feeling about the situation.
> Plaster asked her to come into the living room to talk. When Rogers sat down, Plaster attempted to put his hands down her pants. She pushed him away and asked what he was doing. Plaster then offered to give her drugs if she would sleep with him. Rogers declined and got up to leave. Plaster asked Rogers not to tell her dad what happened. Rogers did not respond but just left.
> The next morning, Rogers told her dad what had happened the night before. Rogers had experimented with drugs, and her father knew this. Rogers had lied about things during her drug use (as most teenagers do). The Petitioner did not want to jump to conclusions. The Petitioner wanted to believe her, but he didn't know if she was telling the whole truth since she had lied before.

---

[2] The Court notes that Hughes failed to provide an affidavit or declaration from Rogers providing her sworn testimony either in state court or in this Court. Hughes contends that he was not permitted an evidentiary hearing in state court; however, this fails to address adequately why he never submitted an affidavit to the Court. Nevertheless, even considering this proffered evidence, it fails to demonstrate that Hughes was any less guilty of first-degree murder.

6

> The Petitioner wanted to hear Plaster's side of the story before accusing Plaster. The Petitioner invited Plaster over to the house, and the Petitioner sat down at the dining room table with both Rogers and Plaster.
> The Petitioner asked Rogers to repeat what had happened. As Rogers was telling what happened, Plaster often interrupted and attempted to have Rogers change her version of events. After Rogers was finished telling her side of the story, Plaster accused Rogers of lying and being a drug addict.
> It was obvious that the Petitioner believed Rogers based on Plaster's reactions and demeanor. The Petitioner told Plaster not to come to the house anymore, that he was not allowed to see Rogers anymore, and that he was not welcome on their property. From that day forward, Plaster did not speak to Rogers again and complied with the Petitioner's requests.
> A few months later, Plaster and his family moved to another location in Stafford County. They lived there for an[o]ther four months before Plaster disappeared again. Everyone thought he was on a drug bender.
> When Plaster did not come home for a while, it was assumed he had overdosed or something had happened involving Plaster's drug use. After Plaster had been gone for a month, his wife and kids moved back to Maryland, and Rogers never heard from them again.

(ECF No. 1, at 12–15 (paragraph numbers omitted).) Petitioner contends that "[n]o reasonable attorney would refuse to use such a valuable defense witness," and that her testimony would have "provide[d] compelling proof that the supposed motive to kill Plaster *did not exist at the time of the killing*." (*Id.* at 16.) Petitioner further suggests that in light of this testimony, it would be "reasonable to conclude that Benzie and Sullivan acted together and killed Plaster for their own reasons" and "tried to pin the murder on the Petitioner based on [his] status as a tough guy." (*Id.*)

In summarizing and rejecting this claim, the Circuit Court explained during the hearing on the claim:[3]

> As you pointed out I did preside over the trial and certainly observed Mr. Feldmann's performance throughout the trial and found it to be anything but ineffective assistance at the trial.
> But we focused on one specific issue for purposes of the habeas petition and that deals with the proposed testimony of Mr. Hughes's daughter. And

---

[3] The decision of the Circuit Court was the last reasoned state court decision addressing these claims, and its reasoning is imputed to the Supreme Court of Virginia, which refused further review without discussion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

7

frankly I don't know that I want to jump to the conclusion that the sum of the daughter's proposed testimony actually makes it worse, but it certainly doesn't make it better.

The wife incident following thereafter, certainly the argument would have been a strong one, but that's even more likely to set him off against the backdrop of an even worse incident involving the daughter than that which he testified to at the trial. Particulars of not just words or kidding, but the actual physical claim of putting his hand down her pants and certainly in violation, the wife incident, would certainly be in violation of the alleged having worked it out. That he's just not going to have any contact with our property or my family anymore. Unlike the way the Defendant claims to have -- Mr. Hughes claims to have dealt with the matter at that time.

There's no similar claim that was asserted with respect to having handled the incident with the wife other than the way the Commonwealth put forth their case. The proposed testimony as it was pointed out by Mr. Murphy is not testimony that would go to any aspect of the crime. Any element of the crime. Motive not being required to be proven. Nor is it exculpatory for establishment of an alibi.

As was also pointed out certainly the fact that the proper testimony would be from Mr. Hughes' daughter, that's another aspect of cross-examination of that witness. That certainly would apply as well in terms of her motive to fabricate, meaning desire, to help spare her father.

What we're dealing with is a matter of Counsel's trial strategy, because this testimony was known at the time and it was indicated in the paperwork that in fact the daughter was here, but the decision was made not to put that testimony on.

Certainly there's a reasonable basis from the arguments that have been heard here today for that decision to have been made as opposed to the allegation that it was ineffective assistance. Likewise, against the backdrop of all the evidence that was introduced in the case and is not prejudicial to Mr. Hughes for that, that testimony not to have been given at trial. And certainly there was talk about Benzie and Sullivan.

But, leaving them aside for the moment. I'll get back to them in just a moment. The fact that we have the neighbor, as the phrase is frequently, without a dog in the fight having made the observations of about what was going on and about the lime and so forth. Without any effective cross-examination or tearing down of those observations.

It just goes again to the volume of the evidence that was produced by the Commonwealth in the case against Mr. Hughes. Certainly Mr. Hargett is correct that what we are dealing with was a cold case. That's short-hand that we referred to at the time when it was here for trial, that it was a cold case.

But as it turns out by the statement that's being proffered, it wasn't just words or kidding with her. The daughter's statement goes beyond the trial testimony to this issue of Plaster having put his hand down her pants.

And the one percent issue, of course that was an issue litigated at trial. That was one of the main issues that went up on appeal to the Court of Appeals.

8

And in all that I'm not sure, and this is probably on me as much as on anybody else, I'm not sure that the way it was articulated at trial actually came across in the transcripts or the upper Courts, the Appellate Court's ruling, as it was proffered at the time of the trial.

It's correct that the time line is such that there wasn't an allegation that he was a one percenter at the time of the killing. The one percent argument, as I recall it, was if Benzie and Sullivan were going to make up a story about someone else committing the murder to get themselves off the hook, why would they have picked him. They would have picked someone else who they didn't feel would endanger themselves in prison, their families out in the community. That was the essence of the Commonwealth's argument, as I recall it, at the time.

And it seems to have gotten a lot of other treatment in the subsequent history of the case once he got past the incident with his daughter. And then we have the incident with his wife.

Again, I just don't see the standard would be reasonable probability. In fact against the total backdrop all the things that I just mentioned that that would engender a reasonable probability of the jury reaching a different verdict.

(Aug. 7, 2018 Tr. 20–25.) The Circuit Court concluded in its order denying the habeas petition:

The Court further finds that the performance of petitioner's trial attorney was anything but ineffective. . . . [T]he Court further finds that the testimony of Vallen Rogers, the petitioner's daughter, would not have made petitioner's case any better. The Court further finds that the proposed testimony did not address any aspect or element of the crime and was not exculpatory. The testimony of the daughter that the victim had put his hand down her pants would have strengthened the Commonwealth's case that Hughes had killed the victim because of his actions towards Hughes's wife and daughter. The Court further finds that the petitioner has not produced any evidence that the victim's conduct toward petitioner's wife had been dealt with in any way different from that suggested by the Commonwealth at trial. The Court further finds that the daughter's testimony would have been of limited value in light of her clear motive to aid her father's defense.

The Court further finds that the attorney's decision not to present the daughter's testimony was reasonable. The Court further finds that that decision did not cause any prejudice to the petitioner. The Court further finds that the petitioner has not demonstrated a reasonable probability that presentation of the daughter's testimony would have changed the outcome of the trial. In light of the volume of evidence produced against the petitioner, the Court further finds that the petitioner has not shown any prejudice.

Consequently, the Court rules that, under the criteria set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), the petitioner has not shown that his attorney was ineffective, and that, therefore, [his] claim . . . should be dismissed.

9

(ECF No. 7-6, at 2-3.) The Court discerns no unreasonable application of the law and no unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)–(2).

As a preliminary matter, the overwhelming evidence presented at trial established that Petitioner murdered Plaster. The record also bears out that Petitioner had a motive to kill Plaster, based on the sexual advances Plaster made on Petitioner's daughter and wife. Benzie and Sullivan both provided police with nearly identical accounts of Plaster's murder. (July 21, 2014 Tr. 301.) Benzie testified that Petitioner told him that Plaster had made sexual advances on his wife and that he was afraid that Plaster might rape his daughter or wife when he was not at home. (July 22, 2014 Tr. 39, 132–33.) Petitioner devised a plan to lure Plaster into the woods on Benzie's family's property to look for buried firearms, and Benzie and Sullivan agreed to the plan. (July 21, 2014 Tr. 298; July 22, 2014 Tr. 9–10, 38, 59, 66, 226.) Both Benzie and Petitioner knew there were no guns buried in the woods. (July 22, 2014 Tr. 81.) After devising the plan, Petitioner and Sullivan left Benzie's property to buy lime. (July 22, 2014 Tr. 68.) Benzie's brother-in-law observed the four men together, and noticed lime in the back of Petitioner's truck, and he asked Petitioner, "what the hell are you going to do, bury somebody[?]" (July 22, 2014 Tr. 156, 161, 173.) Both Benzie and Sullivan testified that Petitioner shot Plaster in the chest with a derringer pistol that belonged to Petitioner, and then Sullivan shot him several times again when Petitioner told him to shoot. (July 22, 2014, Tr. 8, 15–16, 228–30, 234, 277–78.) Sullivan testified that he barely knew Plaster, and had no reason to dislike him, but that Sullivan feared Petitioner and thought it would be better to be a participant than a mere witness. (July 22, 2014 Tr. 232–33, 235–36, 277–78.) Sullivan testified that after they shot Plaster, Petitioner stated, "well, I guess he won't mess with anyone else's

wife," and explained the story of what happened between Plaster and his wife. (July 22, 2014 Tr. 236–37.)[4]

Years later, Both Benzie and Sullivan led police to the same area where they had buried Plaster's body. (July 21, 2015 Tr. 254, 255, 276, 301; July 22, 2014 Tr. 24–25, 117, 245–46.)

The Court fails to discern how the daughter's testimony would have bolstered Petitioner's defense. Rather, at best, her proffered testimony would have duplicated, and at worst, would have emphasized, evidence already in the record about Petitioner's motive for killing Plaster. Counsel's trial strategy attempted to prove that Benzie and Sullivan murdered Plaster with no involvement from Petitioner, a theory that the jury soundly rejected based on the overwhelming evidence of Petitioner's guilt. Petitioner now argues that Rogers's testimony would have established that he had resolved his problems with Plaster related to his daughter and that he would have had no motive to kill Plaster.

Petitioner himself testified about Plaster making sexual advances on his daughter and his wife. (July 23, 2014 Tr. 139–42, 172–81.) Petitioner downplayed his anger toward Plaster and stated that he did not necessarily believe his daughter's story and that he thought Plaster may have been joking around. (July 23, 2014 Tr. 140, 175–77.) Petitioner agreed that he sat them both down and told Plaster that he did not want him alone with her again. (July 23, 2014 Tr. 141.) Petitioner admitted that Plaster's advances on his wife offended him and made him angry,

---

[4] Sullivan inquired about whether Plaster's murder was "because he messed with [Hughes's] wife," and Sullivan testified that Hughes explained as follows:

> He told me that his wife was on the front porch at their home. Mr. Plaster was renting the house next door. Mr. Plaster walked over to there while Bill was not home, Mr. Hughes was not home, and Mr. Plaster walked over while - - and exposed hisself to Bill's wife and said how does this compare to Bill.

(July 22, 2014 Tr. 236–37.) Hughes himself testified to the exact same events during trial but indicated that he did not confront Plaster but "wasn't happy about it." (July 23, 2014 Tr. 142.)

11

but he indicated that he "didn't do anything" as a result. (July 23, 2014 Tr. 142, 179, 181.) Rogers allegedly would have testified that her father did believe her and banished Plaster from the house and from seeing Rogers, testimony that would have differed from Petitioner's own. However, even if the Court were to assume that Petitioner had resolved the conflict over his daughter with Plaster, the record establishes that Plaster thereafter exposed himself to Petitioner's wife after, providing further support for his motive for killing Plaster. Petitioner's admission that Plaster's actions toward his wife angered him bolsters this. Counsel reasonably perceived that calling Rogers would not provide any useful defense testimony, much less exculpatory testimony, and would not likely result in a different trial outcome. Rather, calling Rogers as a witness would provide further evidence of Petitioner's motive for killing Plaster, and quite simply, would reaffirm Petitioner's guilt of murder. Thus, counsel made an imminently reasonable decision not to call Rogers to testify. Petitioner fails to demonstrate that counsel was deficient or any resulting prejudice from not calling Rogers as a witness. Accordingly, Claim One lacks merit and will be DISMISSED.

## IV. CONCLUSION

For the foregoing reasons, Respondent's Motion to Dismiss (ECF No. 6) will be GRANTED. Petitioner's claim will be DISMISSED and his § 2254 Petition will be DENIED. The action will be DISMISSED. A certificate of appealability will be DENIED.[5]

An appropriate order will accompany this Memorandum Opinion.

Let the Clerk file a copy of the Memorandum Opinion electronically and send a copy to Plaintiff.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Dated: February 3, 2021

---

[5] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Hughes fails to meet this standard.